ACCEPTED
02-15-00119-CV
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
7/10/2015 9:27:36 AM
DEBRA SPISAK
CLERK

# IN THE COURT OF APPEALS

## SECOND DISTRICT OF TEXAS AT FORT WORTH

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS

7/10/2015 9:27:36 AM
DEBRA SPISAK
Clerk

_____

### No. 02-15-000119-CV

_____

## CITY OF CARROLLTON, TEXAS

## V.

## MILAN HAMRLA, PETRA CHUDEJOVA, MICHAEL AND LAURA BREWER, DALIA CHAVARRIA, DIANE AND GENE HINES, AND KEITH EFFERT

_____

## APPELLEES' BRIEF

## ORAL ARGUMENT IS REQUESTED

Bruce E. Turner
Texas Bar No. 20310500
bturner@bennettweston.com
J. Michael Weston
Texas Bar No. 21232100
jmweston@bennettweston.com
Bennett Weston LaJone & Turner PC
1603 LBJ Freeway, Suite 280
Dallas, Texas 75234
Telephone: 972-862-2332
Facsimile: 214-373-2570

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

Page

Table of Contents ........................................................................ ii

Index of Authorities .................................................................... iv

Statement Regarding Oral Argument............................................ vii

Statement of Facts........................................................................ 1

    *The Slope*........................................................................ 2

    *May 2009* ...................................................................... 4

    *Continuing Global Slope Failure*.................................... 5

    *Carrollton's Warnings About Slope Failure* .................. 7

    *Missing Records* ............................................................ 10

    *Taking Earth* ................................................................. 12

    *History*........................................................................... 13

    *Retaining Wall*............................................................... 16

    *Problems from Slope Failure*.......................................... 17

Summary of the Argument............................................................ 18

Argument ..................................................................................... 19

    *Standard of Review*........................................................ 19

**Reply to Issue I - Inverse Condemnation** ..................................... 20

    *Inverse Condemnation* ....................................................... 21

    *Taking of Earth* ................................................................ 24

    *Taking By Slope Failure* ................................................... 25

    *Knowledge of Effects of Actions* ....................................... 26

**Reply to Issue II - Negligence** ....................................................... 31

    *Negligence* ...................................................................... 31

**Reply to Issue III - Declaratory Judgment** ................................... 33

**Prayer** ......................................................................................... 36

**Certificate of Compliance** ........................................................... 37

# INDEX OF AUTHORITIES

**Constitution and Statutes**                                          **Page**

Article I, section 17(a) of the Texas Constitution ............................. 18, 21

Tex. Civ. Prac. & Rem. Code § 37.004(a) ........................................... 34

Tex. Civ. Prac. & Rem. Code, § 101.001 *et seq.* .................................. 31

Tex. Civ. Prac. & Rem. Code, § 101.021 ............................................. 31

**Cases**

*City of Amarillo v. Burch,* 369 S.W.3d 684 (Tex. App. - Amarillo 2012, no pet.) ................................................................... 23

*City of Carrolton v. RIHR Inc.,* 308 S.W.3d 444 (Tex.App.-Dallas 2010, rev. denied) ................................................. 22, 29

*City of Dallas v. Jennings,* 142 S.W.3d 310 (Tex.2004) ................. 24, 28, 30

*City of Dallas v. Stewart,* 361 S.W.3d 562 (Tex. 2012) ..................... 23

*City of El Paso v. Heinrich,* 284 S.W.3d 366 (Tex. 2009) ................ 35

*City of El Paso v. Mazie's, L.P.,* 408 S.W.3d 13 (Tex.-El Paso 2012, rev. denied) ...................................................... 24

*City of El Paso v. W.E.B. Investments,* 950 S.W.2d 166 (Tex. App. - El Paso 1977, rev. denied) .............................................. 31

*City of Houston v. Carlson,* 451 S.W.3d 828 (Tex. 2014) ................. 29

*City of Houston v. Wall,* 207 S.W.2d 664 (Tex.App.-Galveston 1947, writ ref'd n.r.e.) ...................................................... 23

*City of Keller v. Wilson,* 168 S.W.3d 802 (Tex. 2005) ...................26-27, 30

*City of San Antonio v. Pollock*, 284 S.W.3d 809 (Tex. 2009)...... 26, 28-30

*Cozby v. City of Waco*, 110 S.W.3d 32 (Tex.App.-Waco
2002, no pet.) ................................................................... 23

*DuPuy v. City of Waco*, 396 S.W.2d 103 (Tex. 1965) ........................ 22

*Edwards Aquifer Authority v. Day,*
369 S.W.3d 814 (Tex. 2012) ........................................... 24

*Hale v. Colorado River Mun. Water Dist.*, 818 S.W.2d 537
(Tex.App.—Austin 1991, no writ) ...................................... 24

*Harris Cnty. Flood Control Dist. v. Kerr,* --- S.W.3d ---,
2015 WL 3641517, *2-3 (Tex. June 12, 2015) .................................... 20

*Hidalgo Cnty. Water Improvement Dist. No. 2 v.
Holderbaum*, 11 S.W.2d 506 (Tex. Comm'n App. 1928,
judgm't adopted) ................................................................. 24

*Hubler v. City of Corpus Christi*, 564 S.W.2d 816
(Tex.App.-Corpus Christi 1978, writ ref'd n.r.e.) ............................... 23

*Magnolia Pipe Line Co. v. City of Tyler*, 348 S.W.2d 537
(Tex.Civ.App.—Texarkana 1961, writ ref'd) ....................................... 23

*Manning v. Embridge Pipelines (East Texas), L.P.,*
345 S.W.3d 718 (Tex. App. - Beaumont 2011, rev. denied) ............... 34

*Marcus Cable Assocs., L.P. v. Krohn,* 90 S.W.3d 697
(Tex. 2002) ................................................................. 25

*Mayhew v. Town of Sunnyvale*, 964 S.W.3d 922
(Tex. 1998) ................................................................. 21-22

*Roberson v. City of Austin,* 157 S.W.3d 130
(Tex. App.-Austin 2005, pet. denied)................................................ 34

*Simon v. Nance,* 45 Tex. Civ. App. 480, 100 S.W. 1038
(Tex. Civ. App. - Austin 1907, no hist.) ............................................ 26

*State v. Brownlow,* 319 S.W.3d 649 (Tex. 2010) ............................. 22, 24

*Suarez v. City of Texas,* --- S.W.3d ---, WL 3802865
(Tex. June 19, 2015) ...................................................................... 20

*Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546
(Tex.2004)............................................................................... 22, 27

*Texas Dept. of Parks & Wildlife v. Miranda,*
133 S.W.3d 217 (Tex. 2004) ............................................................ 21

*Tex. Dep't of Transp. v. Sefzik,* 355 S.W.3d 618 (Tex. 2011)............. 35

*Texas Parks & Wildlife Depar't v. Callaway,*
971 S.W.2d 145 (Tex.App.-Austin 1998, no pet.).............................. 23

*Williams v. Thompson,* 152 Tex. 270,
256 S.W.2d 399 (1953) .................................................................... 26

## STATEMENT REGARDING ORAL ARGUMENT

The Record is extensive and, in places, quite technical. Oral argument could assist the Court by permitting the parties to address questions from the Court about the evidence and the applicable law.

IN THE COURT OF APPEALS

SECOND DISTRICT OF TEXAS AT FORT WORTH
_____

No. 02-15-000119-CV
_____

CITY OF CARROLLTON, TEXAS

V.

MILAN HAMRLA, PETRA CHUDEJOVA, MICHAEL AND
LAURA BREWER, DALIA CHAVARRIA, DIANE AND GENE
HINES, AND KEITH EFFERT
_____

APPELLEES' BRIEF

Milan Hamrla and Petra Chudejova, Michael and Laura Brewer, Dalia

Chavarria, Diane and Gene Hines, and Keith Effert file their Appellees'

Brief.

STATEMENT OF FACTS

Carrollton relies upon its vague and erroneous assertions that it "did

not know, could not have known, and was not substantially certain, that

any of its actions would result in specific damage."  Appellant's Issue I,

Brief p. 5.  Appellant makes scant mention of the Record.  Appellees'

references to the record[1] demonstrate they that have satisfied their burden in establishing jurisdiction.[2]

*The Slope*

This case involves a slope failure on Dudley Branch Creek in Carrollton along the rear of the Appellees' homes.[3] Earth from the Appellees' properties moved onto Carrollton's Dudley Branch Creek right of way.[4] Carrollton's Director of Engineering, Cesar Molina, evidenced Carrollton's attitude towards the slope failure:

> Q.  How would you evaluate whether or not or how you would put the earth back?
>
> A.  I guess they're welcome to go in there and just dig it out.  Put it back on their property.
>
> Q.  So you're going to put it on the Appellees to take back what the city now has?
>
> A.  The city did not take it from them.  It moved there.
>
> Q.  Well, you do admit the city has it?

---

[1]  References to the Record will be have the appropriate volume number with the type of as follows:  Court Record = C.R., Supplemental Court Record = Supp. C.R., Reporter's Record = R.R.  The reference shall be followed by a page reference or for plaintiff or defendant exhibit number in volume 5 of the Report's Record to a document.  For example, 2 C.R. at 2505, 5 R.R., DX 2.

[2]  Appellees refer to just a portion of the evidence before the trial court.

[3]  The common word for a slope failure is landslide.

[4]  2 C.R. at 2504.

A.     Something moved it there.  I'm sure some of it was dirt that was on this side.  Now it's on that side.[5]

The suggestion ignores the warnings of Carrollton's expert  regarding the caution with which the earth on the landslide slope must be handled.[6]

Geotechnical engineers, particularly Carrollton's geotechnical engineer, Terracon Consultants, explained the slope failure.[7]  In its October 2, 2009 Report, Terracon noted as probable causes of the slope failure the "presence of groundwater and seepage from the heavy rainstorms leading up to the slope's failure."[8]  The soil behind the retaining wall at 1325 Barclay after the landslide was so wet and unstable that Terracon could not drill bore holes in which to place inclinometers to measure the movement of the slope.[9]

Appellees' expert, Mark Farrow, summarized the causes of the slope failure:

> The homes were built below the street grade, which . . . meant the drainage was extremely poor. The drainage from the lots had to run back to the retaining wall, which would create a very poor drainage condition in the back of those properties.

---

[5]     2 C.R. at 2505.
[6]     1 C.R. at 1201-1205.
[7]     1 C.R. at 934, 1193.
[8]     1 C.R. at 1200-1201.
[9]     1 C.R. at 944, 1197.

The wall was constructed along a slope that was much too steep for a retaining wall. A 3-to-1 slope is much too steep . . . to be placed next to a retaining wall, because . . . as [Carrollton's expert] indicated, you see slope failures in 3-to-1 slopes routinely in levees and highway embankments . . . that is not in proximity to any . . . structure or residential improvement is one issue, but when you have a slope failure beneath a retaining wall that is supporting residential improvements and a residence, that is a much -- much larger concern, and so retaining walls are just not constructed on -- on slopes that steep. . . . [A]s Terracon concluded in their report, they indicated that the failure was due to deterioration of the soil, but when you do a global stability study -- as engineers, when we do a global stability study, we model -- actually model the soil in a deteriorated condition. We determine how -- when we do triaxial testing or direct shear testing, we actually model how soft the soil will get in a deteriorated condition. And from their study, they indicated the factor of safety was -- was 1.2 without any water impacts, which is well below a safe factor of safety of 1.5.[10]

Carrollton controlled the "presence of groundwater and seepage from the heavy rainstorms" through its retaining wall, its Dudley Branch right of way and its drainage system in the addition.  Carrollton violated its own standards related to the  "presence of groundwater and seepage from the heavy rainstorms leading up to the slope's failure."

*May 2009*

---

[10]    1 C.R. at 973-974, see also 1 C.R. at 977-981.  Carrollton's in-house engineer only disagreed with Terracon's report with regard to the measurement of the slope.  1 C.R. at 1033.  See 2 Supp. C.R. at 1476-1486.

It rained heavily during the night of May 3-4, 2009.[11]  In the morning, Appellee Hamrla, 1325 Barclay Drive, found that his back fence was destroyed, the retaining wall on his property had sunk three feet and moved eight to ten feet towards Dudley Branch.[12]  By July 2013,  the drop was more than seven feet.[13]  The landslide was not isolated to 1325 Barclay.[14]

Appellees did not cause the landslide.[15]  Appellees cannot prevent the slope failure from continuing.[16]  The retaining wall failure was caused by, and not a cause of, the landslide.[17]  On May 11, 2009, Carrollton's engineer stated that repair of the retaining wall would not solve the slope failure.[18]

The affected properties cannot be sold without disclosure of the landslide.  Tex. Prop. Code, § 5.008.  The homes have no value.[19]

*Continuing Global Slope Failure*

Unless something impedes its movement, gravity will cause a slope to flatten.[20]  The likelihood of slope movement is called the factor of safety.[21]

---

11      1 C.R. at 914-915.
12      1 C.R. at 914, 923.
13      1 C.R. at 915.
14      1 C.R. at 1208.
15      1 C.R. at  973-975.
16      1 C.R. at 974-975, 1357.
17      1 C.R. at 1449.
18      1 C.R. at 944, 1197,1470.
19      1 C.R. at 899, 928.
20      1 C.R. at 940-941, 2 C.R. at 2144.
21      1 C.R. at 941-2, 2 C.R. at 2145.

The higher the factor of safety, the more stable the slope.[22]  A factor of safety of 1.5 or more indicates a stable slope.[23]  The International Building Code adopted by Carrollton requires a factor of safety of 1.5 for retaining walls.[24]  According to the Terracon report, the slope's existing factor of safety at the retaining wall before heavy rainfall lead to the slope failure was of 1.013, which signifies imminent failure.[25]  A factor of safety of one designates an occurring landslide or slope failure.[26]

Carrollton's expert described the slope failure as "continuing global failure" and stated that "the failure wasn't just in the yard, it went under the retaining wall and the retaining wall didn't actually fail.  You had a global landslide that impacted the retaining wall."[27]   The scarp of the failed slope continues to move towards and then under the Appellees' homes.[28]

Carrollton governs drainage in Rosemeade 14, on Barclay Drive, and into Dudley Branch all of which contributed to the slope failure.[29]  The retaining wall is part of Carrollton's drainage infrastructure, as are the

---

[22]     1 C.R. at 943, 2 C.R. at 2147.
[23]     4 R.R. at 1120.
[24]     1 R.R. at 1115, 2 C.R. at 1982.
[25]     1 C.R. at 942, 1291, 1221.
[26]     1 C.R. at 1222, 2 C.R. at 2147.
[27]     2 C.R. at 2090.
[28]     1 C.R. at 950, 976.
[29]     Carrollton Ordinance 2581, 1 C.R. at 1228-1339.

Dudley Branch right of way and the sanitary sewer line easement on which the retaining wall was constructed.[30]

*Carrollton's Warnings About Slope Failure*

Carrollton has adopted ordinances and standards to deal with drainage and the problems of erosion.[31] Those ordinances and standards set standards that are to be met to avoid the problems experienced with the Barclay slope. Carrollton violated its own standards with regard to drainage on Barclay Drive and Dudley Branch Creek and retaining wall.

Carrollton's Ordinance No. 2581, "Stormwater and Flood Protection Ordinance,"[32] states a purpose of the Ordinance to be "Control and manage all stormwater runoff and drainage from points and surfaces within subdivisions."[33] The Stormwater Ordinance applies to all areas of land within Carrollton, including, with certain exceptions, property owned by Carrollton.[34] In this case, Dudley Branch, Barclay Drive and the retaining wall are part of Carrollton's drainage infrastructure.[35]

---

[30] 2 Supp. C.R. at 932.
[31] 2 C.R. at 1503.
[32] 1 C.R. at 1228.
[33] 1 C.R. at 1229.
[34] 1 C.R. at 1241.
[35] 1 C.R. at 1271, 2 C.R. at 1563.

In its requirements for the Design of Local Drainage Systems, Section C Street and Alley Capacities, the Stormwater Ordinance provides in paragraph 3:

> The first floor elevations of all residential and other structures shall be set at a minimum elevation of the lower of either 1.5 feet above the alley invert or one foot above the top of the street curb elevation, and with positive drainage provided away from the structure.[36]

Appellees' homes on the creekside of Barclay Drive are below the elevation of Barclay Drive and do not drain on to Barclay Drive. Water at the front of the homes flows to the homes and then towards Dudley Branch.[37]

In its report, Terracon found that the Dudley Branch Creek slope was three feet horizontal to one foot vertical.[38] This slope, maintained by Carrollton, violates the Stormwater Ordinance which requires a 4 to 1 slope.[39]

In its December 1992 Erosion Control Master Plan Carrollton makes a number of comments directly relevant to the allegations regarding Carrollton's obligations for the landslide.[40] A significant concern in the

---

[36]   1 C.R. at 1261, 2 C.R. at 1571.
[37]   1 C.R. at 973.
[38]   1 C.R. at 1219.
[39]   1 C.R. at 1268, 2 C.R. at 1562 (Ordinance No. 1375 enacted in December 1986).
[40]   1 C.R. at 1340.

Erosion Control Master Plan was the stability of sideslope.[41]  Regarding the

erosion process, the Erosion Control Master Plan states:

> Many of the channel areas in the City of Carrollton are located in clay soils. Clay soils have high cohesive properties and under dry conditions will exist with steep banks. *Under high rainfall and flooding conditions the clay soils become saturated and lose their cohesive strength.* The loss of cohesive strength *results in unstable slopes and sideslope failures.* A frequently experienced erosion process includes the following conditions:
>
> 7.   *Steep channel sideslopes become saturated and unstable.*
>
> 8.   *Sideslopes fail in unstable planes and continue to become wider and deeper.*[42]  (Emphasis added)

The erosion process causes a three fold problem, the second of which is

"Channel sideslopes are unstable and are subject to sloughing or rotational

failures.[43]

Regarding the specific area in which the slope failure occurred,

Carrollton's December 1992 Erosion Control Master Plan states "This

erosion is undermining the concrete channel section and resulting in slope

failures.  *The slope failures are in danger of impacting retaining walls,*

*fences, and residences.*[44]  (Emphasis added).

---

[41]   1 C.R. at 1342, 1343.
[42]   1 C.R. at 1344.
[43]   1 C.R. at 1344.
[44]   1 C.R. at 1335.

Understanding that Terracon's October 2009 report described the earth at the slope failure as various forms of clay,[45] the following statement from the Erosion Control Master Plan is particularly important:

> The worst case condition for slopes, which consisted of predominantly clay soils, occurs when the slopes become saturated from frequent rainfall and flooding. *Under these conditions the clay soils loose their cohesive strength and develop internal water pressure which result in slope failures.* Retention systems must be designed to prevent these soils from movement under these conditions.[46]

(Emphasis added). The quoted excerpts show Carrollton knew that its failure to follow its own standards would result in slope failure.

*Missing Records*

Carrollton's failure to maintain legally mandated records,[47] some of which once existed and others of which were never maintained complicated the presentation of evidence.[48]

As an example of the impact of the missing documents, Appellees direct the Court to testimony from Michael McKay, the Carrollton engineer in charge of "review of development plans, . . . construction inspection, and

---

[45]   1 C.R. at 1199-1200.
[46]   1 C.R. at 1358.
[47]   1 C.R. at 2223-2228.
[48]   2 C.R. at 2216, 2223-2234.

. . . drainage,"[49] regarding the retaining wall that is central to this case.[50] The exhibit being discussed states that Carrollton "approved the construction plans for the wall, inspected the wall during construction and accepted the improvements on completion." Carrollton also received a maintenance bond for the wall.[51] Looking at the exhibit, McKay testified:

Q.  Okay. Then the next sentence says, the City approved the construction plans for the wall. Do you see that?

A.  Yes.

Q.  Did you find anything in the records of the City of Carrollton improving -- approving the construction plans for the wall?

A.  No, I did not.

Q.  The next section says, inspected the wall during construction. Did you find anything that related to inspection of the wall during construction?

A.  I found no documentation of that.

Q.  And that the City accepted the improvements on completion. Do you see that?

A.  I see that, yes.

---

[49]  2 R.R. at 31.
[50]  According to McKay, Carrollton has no standards for retaining walls in private property other than have to be signed and sealed by a professional engineer. 2 R.R. at 44. However, Carrollton adopted the International Building Code with regard to retaining walls which requires a factor of safety of 1.5. 1 C.R. at 1044.
[51]  1 C.R. at 1225.

Q.    Did you find anything that says that they accepted the documents -- the retaining wall?

A.    I saw no specific documents that said that they had accepted it.[52]

Documents once existed related to the first retaining wall include (a) a proposal and contract for a reinforced concrete retaining wall, (b) a "Preliminary Engineering Observation Report" on the retaining wall failure, (c) letters from Carrollton regarding review of retaining wall repairs, (d) a letter from engineers revising plans for retaining wall repair, (e) a letter requesting city fill in eroded areas along retaining wall, and (f) documents related to decision of builder not to develop lots between 1319 and 1331 "because they were deemed to be undesirable."[53]  Carrollton provided no explanation for the failure to produce the documents in discovery other than the documents do not exist.

The Motion for Sanctions details more problems with documents.[54]

*Taking Earth*

Carrollton is taking earth from both the surface of and under Appellees' properties.[55]  The slope failure occurs underground.[56]   The earth

---

[52]    2 Supp. C.R. at 1581, 2 R.R. at 63-67.
[53]    1 C.R. at 1226-1227.
[54]    2 C.R. at 2216.
[55]    2 C.R. at 2088-2089.

movement damaged and damages the surface and surface structures, including to the retaining wall and the subsurface.[57]

*History*

In 1981, Carrollton accepted a 15 feet wide sanitary sewer easement along what became the rear of the affected Barclay properties.[58] The property owners subject to the easement, including all of Appellees, cannot construct anything on the easement without Carrollton's permission.[59]

Carrollton approved the Rosemeade 14 final plat in September 1986.[60] The retaining wall was built on the sewer easement.[61] On July 21, 1987, Carrollton accepted the retaining wall and a maintenance bond stating that the retaining wall had been correctly installed.[62] The retaining wall is part of Carrollton's storm water drainage infrastructure.[63] Stormwater in Rosemeade 14, other than for the odd side of Barclay Drive, drains on to the roads and alleys of the subdivision. Barclay Drive is higher

---

[56]   1 C.R. at 951-952.
[57]   1 C.R. at 952, 2 C.R. at 2089.
[58]   1 C.R. at 1103.
[59]   2 R.R. at 51.
[60]   5 R.R. DX 2.
[61]   5 R.R. DX 2, Rosemeade010.
[62]   1 C.R. at 1225.
[63]   Tumulty Deposition, 2 C.R. at 2340-2341, Molina Deposition, 2 C.R. at 2442, 2446-2448, 2450.

than the affected Barclay properties.[64]  The Dudley Branch slope is too steep.[65]

The retaining wall had problems in 1987 behind 1317 and 1319 Barclay Drive.  Documents related to the problems once existed.[66]  In February 2007, Carrollton declared that the retaining wall located at 1317 and 1319 Barclay:

> has been found in a state of disrepair and appears structurally unsound and is in danger of collapse causing an obstruction of the drainage channel and possible severe damage to the homes located at both 1317 Barclay and 1319 Barclay. The conditions of the retaining wall render the structure and premises as a "Dangerous Building."[67]

Other than the notices, no documents exist.

In the 1990's an event occurred which evidences slope failure.[68] Carrollton has no geotechnical engineer report explaining the "wall failure."[69]  In 1993, Carrollton's Engineering Department issued warnings about construction on affected Barclay Drive properties.[70]  Nine of the

---

[64]     1 C.R. at 973.
[65]     1 C.R. at 973.
[66]     2 Supp. C.R. at 392.
[67]     1 C.R. at 1429-1431.
[68]     1 C.R. at 964-965.
[69]     1 C.R. at 1103, 2 C.R. at 2220, 2230-2233.
[70]     1 C.R. at 1099-1102. "These addresses are empty lots that back up to Dudley Branch.  There is a retaining wall on the back of the lots.  This wall has failed in several areas (1341-1343 & 1347) where either the house or the pool/spa is within 10 feet of the retaining wall.  To avoid anymore possible wall failures, I would suggest that the builder place the house as close to the street as legally allowed."

houses on the affected Barclay properties were constructed after the 1990's event, including homes located at 1323-1329 Barclay Drive.[71]

After the 1990's problems with the slope and retaining wall, Carrollton conducted no investigation of the slope or the retaining wall. Carrollton continues to maintain and repair Dudley Branch, Barclay Drive and the retaining wall so as to continue the factors that caused the slope failure.

In 2008, Carrollton, responding to information about a crack in the retaining wall, inspected the retaining wall and took photographs. The photographs evidence an on-going slope failure.[72] Before the May 2009 landslide, adjacent to Dudley Branch a large water filled hole developed in the Dudley Branch channel due to erosion.[73] The hole and water may have changed the factor of safety of the slope.[74] Carrollton filled the hole after the May 2009 slope failure.[75]

When faced with accumulating water on their lots, some Barclay residents attempted to alleviate the accumulation of water by installing

---

[71]   1 C.R. at 1109-1110.
[72]   1 C.R. at  965.
[73]   1 C.R. at 465 (photograph after repair), 1441.
[74]   1 C.R. at 964-965.
[75]   1 C.R. at 736-737.

French drains to move the water to Dudley Branch. [76] Accepted engineering standards and Carrollton's standards require French drains for lots with retaining walls.[77] French drains were not installed as part of the retaining wall or of the drainage system.

*Retaining Wall*

Retaining walls are supposed to permit the drainage of water along and under a slope, and to impede movement of the slope and objects (earth and improvements) down the slope.[78]

The Rosemeade 14 developer submitted an "as-built" drainage plan dated June 1986.[79] The as-built drainage plan merely states "construct" a retaining wall and provides no drawings of the retaining wall.[80] Carrollton's drainage system resulted in the affected Barclay properties draining to the back of the lots where ponding occurred adjacent to the

---

[76]    1 C.R. at 419, 910.

[77]    1 C.R. at 2688, Carrollton General Design Standards, page 24, Section 3G-2 "French Drain System: A french drain system, composed of a minimum six inch diameter perforated PVC pipe, will be installed between the back of curb and right-of-way line whenever adjoining lot elevations necessitate the use of retaining walls to maintain lot grades. French drain system must be connected to the storm sewer system."

[78]    2 C.R. at 1982.

[79]    5 R.R. DX 2, Rosemeade010.

[80]    5 R.R. DX 2, Roll031-TS000170. Note that the other "plans" are detailed drawings.

retaining wall.[81]  The affected Barclay properties become saturated which lowers the slope's factor of safety, which contributed to the slope failure.

Carrollton violated accepted engineering standards and its standards with regard to the retaining wall and the drainage of the affected Barclay properties.[82]

*Problems from Slope Failure*

The surface effect of the slope failure can be seen in February 2008, May 2009, 2011 and 2013-2014 photographs of the backyard at 1325 Barclay Drive.[83]  The Brewer Appellees abandoned their swimming pool for safety concerns.[84]  Adjacent properties have similar but less severe problems.  Appellee Effert (1329 Barclay Drive), David Wozniak (1343 Barclay Drive) and other owners of property behind the reconstructed retaining wall have seen the anchored retaining wall sinking, the earth moving towards Dudley Branch and the retaining wall breaking. [85]  The Effert property sinks so much that Effert spreads 200 forty pound bags of dirt on his backyard each year.[86]

---

[81]     2 C.R. at 2376-2380.
[82]     2 R.R. at 76-77.
[83]     1 C.R. at 1086, 1088, 1453-1454, 5 R.R., PX 16, 18, 27 and 30.
[84]     1 C.R. at 892, 902.
[85]     3 R.R. at 87-88, 91.
[86]     3 R.R. at 87.

All of Carrollton actions with regard to drainage, maintenance of Barclay Drive, and erosion control were accomplished with motor driven vehicles and motor driven equipment.[87] Carrollton's actions constitute negligence and proximately caused the injuries and damages of which Appellees complain.

SUMMARY OF THE ARGUMENT

Issue I

Carrollton established standards to be followed for stormwater and drainage infrastructure in its territory. Carrollton justified its standards by noting the consequences of failing to adhere to the standards, including specific references of resulting slope failure. Carrollton did not follow its standards with regard to Appellees' properties. The warned of consequences occurred in the form of a continuing global slope failure.

Carrollton's actions constituted a taking under Article I, Section 17(a) of the Texas Constitution.

Issue II

---

[87]    1 Supp. C.R., 30-31, 2 Supp. C.R., 880-881, 945-949.

Carrollton's actions with regard to Appellees' breached Carrollton's obligations to Appellees as established by Carrollton. The breaches proximately caused Appellees injuries and damages.

Issue III

The court has jurisdiction over Appellees' damages claims against Carrollton and that jurisdiction includes jurisdiction needed to assert claims for Declaratory Judgment relief. Appellees seek a declaration of Carrollton's duties and obligations regarding stormwater and drainage under its standards and ordinances with regard to Appellees' properties.

ARGUMENT

*Standard of Review*

This is the standard of review of the denial of Carrollton's Plea to Jurisdiction:

> Whether subject-matter jurisdiction exists is a question of law that can be challenged, as it was here, by a plea to the jurisdiction. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex.2000). We review de novo the disposition of Texas City's jurisdictional plea. *Miranda*, 133 S.W.3d at 226. Because we address a plea to the jurisdiction in which disputed evidence implicates both the court's subject-matter jurisdiction and the merits of the case, we consider relevant evidence submitted by the parties to determine if a fact issue exists. *Id.* at 227. We take as true all evidence favorable to the nonmovant, indulge every reasonable inference, and resolve any doubts in the nonmovant's favor. *Id.* at 228. If the evidence creates a fact question regarding jurisdiction, the plea must be denied pending resolution of

the fact issue by the fact finder. *Id.* at 227–28. If the evidence fails to raise a question of fact, however, the plea to the jurisdiction must be granted as a matter of law. *Id.* at 228.

*Suarez v. City of Texas,* --- S.W.3d ---, 2015 WL 3802865, *6 (Tex. June 19, 2015); also *Harris Cnty. Flood Control Dist. v. Kerr,* 2015 WL 3641517, *2-3 (Tex. June 12, 2015).  Appellees met their burden to sustain jurisdiction over this matter.

Reply to Issue I.

> Whether the trial court has subject-matter jurisdiction over Appellees' takings claim when the evidence shows the City did not know, could not have known, and was not substantially certain, that any of its actions would result in specific damage to Appellees' property.

Carrollton violated the standards it imposed to control stormwater and drainage and caused the injuries Carrollton used to justify the imposition of its requirements.  This fact alone establishes the requisite knowledge and intent.  *Harris Cnty. Flood Control Dist. v. Kerr,* 2015 WL 3641517 at *3:

> In a takings case, "the requisite intent is present when a governmental entity knows that a specific act is causing identifiable harm or knows that the harm is substantially certain to result." *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 555 (Tex.2004). It is not enough that the act causing the harm be intentional–there must also be knowledge to a substantial certainty that the harm will occur. *City of Dallas v. Jennings*, 142 S.W.3d 310, 313–14 (Tex.2004). Intent, in takings cases as in other contexts, may be

-20-

proven by circumstantial evidence. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986).

Carrollton warned of the consequences of not complying with its drainage requirements. Carrollton did not comply with its standards. The warned of consequences occurred.

The district court has jurisdiction over Appellees' claims for taking private property for public use without just compensation. Tex. Const. Art. I, § 17. Sovereign immunity has been waived under the Texas Tort Claims Act. Because jurisdiction exists for Appellees' taking and tort claims, jurisdiction exists over Appellees' Declaratory Judgment Act claims to determine Carrollton's obligations to remedy the slope failure and maintain the property in its control so as to avoid a recurrence of the slope failure.

Appellees filed sufficient pleadings and provided extensive evidence that precludes the granting of Carrollton's plea to jurisdiction. *Texas Dept. of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 228 (Tex. 2004).

*Inverse Condemnation*

Article I, section 17(a) of the Texas Constitution provides that: "No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person . . . ." *See Mayhew v. Town of Sunnyvale*, 964

S.W.3d 922, 933 (Tex. 1998); *City of Carrolton v. RIHR Inc.,* 308 S.W.3d 444, 448-449 (Tex.App.-Dallas 2010, rev. denied) (dispute over payment for retaining wall repairs and city's demand for payment before issuance of a building permit was an unconstitutional exaction).

Whether particular facts constitute an unconstitutional taking is a question of law for the court. *Mayhew v. Town of Sunnyvale*, 964 S.W.3d at 937. The Supreme Court wrote in *State v. Brownlow*, 319 S.W.3d 649, 652 (Tex. 2010):

> The essence of an inverse condemnation proceeding is that the government has intentionally taken or unreasonably interfered with an owner's use of property and the property owner is attempting to recover compensation for the lost or impaired rights. (citations omitted)

A "taking, damaging, or destruction" for purposes of inverse condemnation is defined as the physical appropriation or invasion of property, or unreasonable interference with a landowner's right to use and enjoy the property. *See Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 552 (Tex. 2004); *DuPuy v. City of Waco*, 396 S.W.2d 103, 108 -109 (Tex. 1965). The evidence is that earth from the surface and below the Appellees' properties is on or under Carrollton's Dudley Branch right of way. Carrollton's apparent objection to the inverse condemnation is not to the

fact of the taking but how the taking of the earth occurred.

A "taking, damaging or destruction" constituting inverse condemnation can occur in a variety of ways:

a. declaration of a nuisance and the demolition of the property. *City of Dallas v. Stewart,* 361 S.W.3d 562 (Tex. 2012).

b. requirement to lower and encasing pipe line under streets established after area incorporated. *Magnolia Pipe Line Co. v. City of Tyler*, 348 S.W.2d 537, 540 (Tex.Civ.App.—Texarkana 1961, writ ref'd).

c. diversion of water through streets and other city "infrastructure" onto landowner's property. *City of Amarillo v. Burch,* 369 S.W.3d 684 (Tex. App. - Amarillo 2012, no pet.).

d. drainage in excess of natural drainage. *Hubler v. City of Corpus Christi*, 564 S.W.2d 816 (Tex.App.-Corpus Christi 1978, writ ref'd n.r.e.).

e. change in drainage flow. *City of Houston v. Wall,* 207 S.W.2d 664 (Tex.App.-Galveston 1947, writ ref'd n.r.e.).

f. build up of dirt adjacent to alley constructed which impaired access to garage and parking. *Cozby v. City of Waco*, 110 S.W.3d 32 (Tex.App.-Waco 2002, no pet.).

g. opening canal over landowner's property to public use in contravention of terms of easement. *Texas Parks & Wildlife Dep't v. Callaway*, 971 S.W.2d 145 (Tex.App.-Austin 1998, no pet.).

h. construction of public works or their subsequent maintenance and operation. *Hale v. Colorado River Mun. Water Dist.*, 818 S.W.2d 537, 539 (Tex.App.—Austin 1991, no writ); *Hidalgo Cnty. Water Improvement Dist. No. 2* v. *Holderbaum*, 11 S.W.2d 506, 507 (Tex. Comm'n App. 1928, judgm't adopted).

i. construction, operation and maintenance of drainage system. *City of El Paso v. Mazie's, L.P.*, 408 S.W.3d 13, 23 (Tex.-El Paso 2012, rev. denied).

Carrollton knows that its actions with regard to its Barclay Drive and Dudley Branch Creek and the retaining wall caused an identifiable harm - slope failure. Carrollton's implemented standards for the construction, maintenance and repair of its drainage system, slopes and retaining walls identify slope failure as a consequence of failing to follow its standards proves intent. *See City of Dallas v. Jennings,* 142 S.W.3d 310, 314 (Tex. 2004)

*Taking of Earth*

Carrollton's chief engineer agrees that on or under Carrollton's Dudley Branch right of way, there is now earth that once was on or under Appellees' property. Taking earth from Appellees' properties is a taking. *Edwards Aquifer Auth. v. Day,* 369 S.W.3d 814, 832 (Tex. 2012) (taking groundwater beneath property), *State v. Brownlow*, 319 S.W.3d at 653

-24-

(earth taken from easement to construct mitigation pond).

Carrollton has the right to build a sewer line on the sewer easement and may have had the right to place the retaining wall on the sewer easement. Carrollton has not claimed the right to take earth from the affected Barclay properties. Carrollton's rights are limited to what is necessary to exercise the right of placing and utilizing the sewer line on the easement. *See Marcus Cable Assocs., L.P. v. Krohn,* 90 S.W.3d 697, 701-702 (Tex. 2002).

A significant amount of earth has been taken since the initial slope failure in May 2009. Carrollton knew that a continuing slope failure was manifested by the May 2009 events. Immediately after the May 2009 slope failure at 1325 Barclay Drive, there was a scarp of roughly three feet, which reflects how much the surface of the backyard of 1325 Barclay Drive had sunk because earth was moving onto the Dudley Branch right of way. At the time of the hearing, the scarp was in excess of seven feet. A lesser damaged property requires 200 40 pound bags of dirt each year to fill in sunken areas.

*Taking By Slope Failure*

If Carrollton changed the Dudley Branch slope outside the retaining

wall and that removal of earth caused a slope failure, there would be a taking by removing the lateral support of the property. *Williams v. Thompson,* 152 Tex. 270, 277-278, 256 S.W.2d 399, 403 (1953), *Simon v. Nance,* 45 Tex. Civ. App. 480, 483-484, 100 S.W. 1038, 1040 (Tex. Civ. App. - Austin 1907, no hist.). In this case, the removal of lateral support comes from a combination of circumstances, all of which are in the exclusive control of Carrollton.

Appellees' properties are falling in to Dudley Branch as a result of the global slope failure. Carrollton's ordinances and standards warn of slope failure and provide standards to be followed to prevent slope failure. Carrollton consistently violated its rules. If Carrollton had obtained expert advice to violate its standards, Carrollton might not be subject to the claim of inversely condemned Appellees' properties. *See City of Keller v. Wilson,* 168 S.W.3d 802 (Tex. 2005). If Carrollton had perceived problems and attempted to remedy the problems, albeit unsuccessfully, Carrollton might not have inversely condemned Appellees' properties. *See City of San Antonio v. Pollock,* 284 S.W.3d 809, 821 (Tex. 2009); *City of Keller v. Wilson,* 168 S.W.3d at 828–830.

*Knowledge of Effects of Actions*

Carrollton knew that its actions and policies with regard to the affected Barclay properties would or were substantially certain to result in the slope failure.  *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d at 551–554.  The Supreme Court 's opinion in *City of Keller v. Wilson* illustrates an important point.  In *City of Keller v. Wilson,*  Keller, like Carrollton, established standards and violated its standards which caused flooding.  The property owners based their claims on the violation of the Keller's standards.  Regarding the issue of knowledge or culpability of Keller, the Supreme Court noted:

> Here, it was uncontroverted that three sets of engineers certified that the revised plans met the City's codes and regulations—and thus would not increase downstream flooding.

*City of Keller v. Wilson,* 168 S.W.3d at 829.  Carrollton established standards, ignored its standards in creating and maintaining drainage for the affected Barclay properties, and ignored its engineer's recommendations of how to avoid future wall failures.  The Supreme Court noted that:

> The missing piece in the evidence here is proof that the City knew the plans it approved were substantially certain to increase flooding on the Wilsons' properties.

*Id.*  The piece is not missing in this case.  Carrollton's standards were

-27-

written to prevent slope failure. Carrollton received no recommendations from experts that it should ignore its standards.

In *City of Dallas v. Jennings*, the Appellees sued for damages after a sewer line backed up and flooded their home with raw sewage, the Court noted:

> Nor do we believe, however, that the City must necessarily intend to cause the damage; if the government knows that specific damage is substantially certain to result from its conduct, then takings liability may arise even when the government did not particularly desire the property to be damaged.

*City of Dallas v. Jennings,* 142 S.W.3d. at 315.  In this case, Appellees rely on Carrollton's' statements implementing its standards to establish "that [Carrollton] believes that the consequences are substantially certain to result from [violations of its standards]."  Carrollton violated its standards.

In *City of San Antonio v. Pollock*, property owners sued because of gases coming from a closed landfill.  When the city found pockets of methane gas near the landfill, it drilled a system of ventilation wells to draw the gases back into the landfill, established monitoring facilities, surveyed water quality, hired a consulting firm,  improved the methane collection system, and, ultimately, installed a new system.  *City of San Antonio v. Pollock,* 284 S.W.3d at 813-814.  The Court noted that the knowledge of the

City cannot be determined in hindsight:

> The Pollocks contend that the City knew its management of the West Avenue landfill was damaging their property, or knew at least that damage to their property was a necessary result. But the evidence is all to the contrary. Whenever the City was aware that gas was migrating from the landfill, it took steps to prevent damage. It monitored gas generation, monitored leachate, and installed methane collection systems.

*Id.* at 821. Even when Carrollton replaced a portion of the retaining wall in the 1990's it (a) did nothing to determine the causes and scope of the problem and solve it, or destroyed or discarded documents reflecting its efforts, (b) did not follow its engineer's recommendations that might have reduced the problems, and (c) ignored future signs of problems.

In February 2008, Carrollton declared a portion of the retaining wall a "dangerous building" which enabled it to take actions to remedy the situation. *See City of Houston v. Carlson,* 451 S.W.3d 828 (Tex. 2014). Carrollton did nothing. *Compare City of Carrolton v. RIHR Inc.,* 308 S.W.3d at 447. After the May 2009 slope failure, in the face of a continuing slope failure, Carrollton did nothing to determine the causes and scope of the problem, ignored numerous warnings of a global slope failure, and falsely denied responsibility for drainage of Appellees' lots and Dudley Branch Creek, and for the retaining wall. Carrollton took steps to conceal

the true problem.

In *City of Dallas v. Jennings, City of San Antonio v. Pollock* and *City of Keller v. Wilson*, the cities obtained professional advice and followed that advice. Based on the lack of documentation, we must assume that Carrollton either failed to get outside professional advice until the May 2009 slope failure or obtained advice and ignored that advice. Carrollton ignored the in-house engineering advice after the "wall failure" in the 1990's. In February 2008, Carrollton declared a portion of the retaining wall a dangerous building. Carrollton did nothing to resolve the situation or even investigate the cause of the retaining wall being a "dangerous building." In May 2009, when Carrollton received the warning of a continuing, global slope failure along Barclay Drive, Carrollton (a) did not determine the scope of the slope failure, (b) did not determine the source of water that lead to the slope failure, (c) denied responsibility, and (d) concealed its responsibility for the slope failure. Carrollton continued its actions with regard to Barclay Drive storm water drainage and Dudley Branch that caused the slope failure.

There is no question that the slope failure resulted in earth previously located on and under Appellees' properties moving so that the earth is now

located under Carrollton's Dudley Branch channel. That is a taking.

Appellees are entitled to the cost of either returning the earth to its proper location, rebuilding the properties to the condition they enjoyed before the taking or the value of the properties if the problem cannot be remedied.

Reply to Issue II

> Whether the trial court has subject-matter jurisdiction over Appellees' negligent-property-damage claim when they have failed to plead and the evidence negates a City-employee use of motor-driven-vehicle or equipment sufficient for a waiver of governmental immunity from suit under the Texas Tort Claims Act.

*Negligence*

Under the Texas Tort Claims Act, Tex. Civ. Prac. & Rem. Code § 101.001 *et seq.*, Carrollton can be held liable for property damage proximately caused by the wrongful act or omission or the negligence of an employee acting within the scope of his employment if the property damage arises from the operation or use of a motor-driven vehicle or motor-driven equipment, and the employee would be personally liable under Texas law. Tex. Civ. Prac. & Rem. Code, § 101.021.

It is not contested that Carrollton used motor-driven vehicles and motor-driven equipment to construct, maintain and repair its drainage system. *See City of El Paso v. W.E.B. Investments,* 950 S.W.2d 166, 170

(Tex. App. - El Paso 1977, rev. denied). As discussed above, Carrollton established the duties and standards that it applied and applies to the construction, maintenance and report of its drainage systems. Carrollton's Department of Public Works maintained and repaired the drainage system, Barclay Drive and Dudley Branch Creek, in a manner that water did not and does not drain from Appellees' properties, causing the water to pond and accumulate on the property, thereby reducing the factor of safety of such properties with the result that the slope failed. Carrollton required specific slopes and factors of safety and French drains for retaining walls. The Barclay Drive retaining wall, part of Carrollton's infrastructure does not meet those requirements.

Pursuant to ordinance, Barclay Drive was to provide drainage for the Appellees' properties, which it does not. Barclay Drive was repaired and maintained with motor vehicles and motor driven equipment in such a manner that Appellees' properties cannot drain on to Barclay Drive. Dudley Branch was repaired and maintained contrary to Carrollton's standards with improper slopes and no provision for drainage of Appellees' properties even though the properties contained Carrollton's retaining wall. All repair and maintenance was done with motor driven vehicles and motor

driven equipment.

Carrollton is liable for its negligence.

As quoted above, in its final report dated October 2, 2009 Terracon, Carrollton's expert, noted regarding the cause of the slope failure the presence of groundwater on the Barclay Drive side of 1325 Barclay Drive. Groundwater that did not drain from Appellees' properties which, if for no other reason, did not drain from Appellees' properties because of the way Carrollton maintained and repaired Barclay Drive and the retaining wall.[88]

Reply to Issue III - Declaratory Judgment

> Whether the trial court has subject-matter jurisdiction over Appellees' requests for declaratory relief and related attorney's fees when Appellees are not seeking to challenge the validity of any City ordinance or franchise.

In their claims for inverse condemnation and negligence, Appellees seek relief for injuries and damages suffered due to the slope failure. In their declaratory judgment action, Appellees seek a judicial resolution of issues related to the future maintenance and repair of Dudley Branch Creek, Barclay Drive and the retaining wall. Appellees particularly seek a declaration of Carrollton's obligations under its standards and ordinances.

---

[88]     C.R. at Vol 1, 1200.

A declaratory judgment action is the proper vehicle to determine issues relating to easements. *Manning v. Embridge Pipelines (East Texas), L.P.,* 345 S.W.3d 718, 727 (Tex. App. - Beaumont 2011, rev. denied), *Roberson v. City of Austin*, 157 S.W.3d 130, 137 (Tex. App.-Austin 2005, pet. denied). Appellees' action is exactly the sort of action that the Declaratory Judgment Act was written to address,

> A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are effected by a statute, municipal ordinance, contract, or franchise may have determined *any question of construction or validity arising under the instrument, statute, ordinance,* contract, or franchise *and obtain a declaration of rights, status, or other legal relations thereunder.*

Tex. Civ. Prac. & Rem. Code 37.004(a) (Emphasis added).

Appellees seek specific declaratory relief under the Texas Declaratory Judgment Act, requesting that declarations that Carrollton employees in its Engineering Department failed to perform ministerial acts under Carrollton's ordinances, rules, regulations and standards and the laws of the State of Texas by failing to

a. determine that the retaining wall is part of Carrollton's infrastructure.

b. complying with ordinances, rules, regulations and standards regarding retaining walls in connection with the retaining wall on the affected Barclay properties.

-34-

c.      complying with its ordinances, rules, regulations and standards with regard to slope stability.

d.      complying with ordinances, rules, regulations and standards with regard to retaining walls.

e.      complying with ordinances, rules, regulations and standards with regard to drainage.

*See City of El Paso v. Heinrich,* 284 S.W.3d 366, 372-373 (Tex. 2009)

Regarding jurisdiction, Appellees accept that sovereign immunity would not be waived for the Declaratory Judgment Act claims if they were seeking to establish jurisdiction through the Declaratory Judgment Act. *See Tex. Dep't of Transp. v. Sefzik,* 355 S.W.3d 618 (Tex. 2011) (plaintiff only sought declaratory relief challenging the denial of a permit), *City of El Paso v. Heinrich* (plaintiff sought declaratory relief and an injunction against state officials). The Declaratory Judgment Act does not enlarge the trial court's jurisdiction, but is "merely a procedural device for deciding cases already in a court's jurisdiction." *Tex. Dep't of Transp. v. Sefzik,* 355 S.W.3d at 621-622 (quoting *Tex. Parks & Wildlife Dep't v. Sawyer Trust,* 354 S.W.3d 384, 388 (Tex.2011)).

Appellees have established jurisdiction independent of the Declaratory Judgment Act claims. Appellees' claims for declaratory relief

seek to have a determination of their "rights, status, or other legal relations . . . effected by a . . . municipal ordinance . . . and obtain a declaration of rights, status, or other legal relations thereunder." The issues raised by Appellees for declaratory relief all relate to claims over which this Court has jurisdiction independent of the Declaratory Judgment Act.

## PRAYER

Appellees pray that the District Court's order denying Carrollton's Motion to Dismiss be in all things affirmed.

Respectfully submitted,

s/ Bruce E. Turner

_____
Bruce E. Turner
Texas Bar No. 20310500
bturner@bennettweston.com
J. Michael Weston
Texas Bar No. 21232100
jmweston@bennettweston.com
Bennett Weston LaJone & Turner PC
1603 LBJ Freeway, Suite 280
Dallas, Texas 75234
Telephone: 972-862-2332
Facsimile: 214-373-2570

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of Appellees'

Brief was served on all counsel of record by electronic service under Tex. R.

App. P. 9.2 on the 10th day of July 2015, in accordance with the

requirements of the Texas Rules of Appellate Procedure. The persons

served are:


Fredrick "Fritz" Quast                      Meredith A. Ladd, City Attorney
George A. Staples, Jr.                      City of Carrollton, Texas
Counsel for Appellant                       1945 East Jackson Road
Taylor, Olson, Adkins, Sralla               Carrollton, Texas 75006
     & Elam, LLP
6000 Western Place, Suite 200
Fort Worth, Texas 76107


/s/ Bruce E. Turner

_____

Bruce E. Turner, Esq.

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 9.4(3) of the Texas Rules of Appellate Procedure, the undersigned authority hereby certifies that according to the word processing software used to prepare this filing, the word count of this document is 7,438.

/s/ Bruce E. Turner

_____

Bruce E. Turner, Esq.